IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

G'ESA KALAFI,

               Plaintiff,

    v.

LEBBEUS BROWN, GARY BOUGHTON,
LIEUTENANT CICHANOWICZ, and
DANIEL WINKLESKI,

               Defendants.

OPINION AND ORDER

Case No.  19-cv-319-slc

---

*Pro se* plaintiff G'esa Kalafi, a prisoner currently incarcerated at Kettle Moraine Correctional Institution, is proceeding in this lawsuit under 42 U.S.C. § 1983, on claims arising out of events that occurred in September of 2015, when Kalafi was incarcerated at the Wisconsin Secure Program Facility (WSPF). I granted Kalafi leave to proceed against the WSPF employees involved in those events – Lebbeus Brown, Lieutenant Cichanowicz, and Daniel Winkleski – on First Amendment free speech and retaliation claims related to those events. Currently before the court is defendants' motion for summary judgment (Dkt. 32.), which I am granting.

By way of overview, on August 28, 2015, Kalafi obtained a writ of certiorari from a state court, based on his challenge to the timeliness of WSPF's review of his administrative confinement. On September 20, 2015, Kalafi attempted to send his mother a mailing comprised of a copy of the state court order accompanied by a letter that contained statements that the defendants interpreted as threats. WSPF officials confiscated Kalafi's mailing and charged him in a conduct report with multiple policy violations. Kalafi was found guilty of the charges following a disciplinary hearing, and his appeal was denied. This civil rights lawsuit followed.

Having considered the evidence of record in the light most favorable Kalafi, I conclude that defendants are entitled to summary judgment on all of Kalafi's claims.  Although the questions whether the statements in Kalafi's letter constituted a true threat would be a question for a jury to resolve, we don't get that far: the defendants' decision to confiscate the court order along with the letter did not violate Kalafi's First Amendment rights.  Further, even assuming, *arguendo*, that the confiscation of the state court's order along with Kalafi's letter violated Kalafi's rights, defendants are entitled to qualified immunity. Finally, as to Kalafi's retaliation claim, Kalafi has not submitted evidence of record that would permit a reasonable fact-finder to conclude that any of the defendants sought to punish Kalafi for challenging his administrative confinement review in state court when they confiscated his mailing and punished him for the threatening comments.  Accordingly, I am granting defendants' motion, entering judgment in their favor, and closing this case.

UNDISPUTED FACTS[1]

A.      **Parties**

G'esa Kalafi was an inmate at WSPF from February 9, 2007, to November 10, 2015, and at all times relevant to this case.

Defendant Lebbeus Brown was a Captain at WSPF during all relevant times.  Brown held the positions of Security Threat Groups (STG) Coordinator and Investigations Captain from 2003 to 2016.  Brown was responsible for leading investigations into potential gang activity and

---

[1] Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of facts and the evidence of record cited below, while viewing that evidence in a light most favorable to Kalafi as the non-moving party.

2

other unsanctioned activity within WSPF.  This included tracking STGs and their members in WSPF and documenting their activities, reviewing incoming and outgoing mail and property for gang-related content, preparing reports regarding disruptive groups and gangs for WSPF security staff and other institutions, instructing staff regarding gang identification and gang management strategies, and meeting with other STG Coordinators from other institutions on a regular basis to exchange information.

Defendant Joseph Cichanowicz was a Lieutenant at WSPF at all relevant times and currently is employed at the Department of Corrections (DOC) training center in Madison, Wisconsin.  Defendant Daniel Winkleski was the Deputy Warden at WSPF from September 2015, until April 2018, at which point he became the warden at a different institution.

### B.      Kalafi's Successful State Court Petition

On June 1, 2015, a state court judge granted Kalafi's petition for a writ of certiorari, in which Kalafi had raised a due process challenge related to his continued placement in administrative confinement.  The court ordered prison officials to hold a new administrative confinement hearing.  Kalafi sought reconsideration of the order on multiple grounds, including the remedy.  On August 28, 2015, the judge granted in part and denied in part Kalafi's motion, granting Kalafi's challenge to the remedy.  The court agreed that the proper remedy would be to vacate the untimely January 10, 2014 administrative confinement hearing, as well as any subsequent rehearing based on the court's June 1, 2015, decision.

Brown, Cichanowicz, and Winkleski were not involved in the administrative confinement placement decisions at issue in the certiorari case.

After receiving this decision, Kalafi wanted to share his success with other inmates on administrative confinement status. Kalafi in particular wanted to provide other inmates with copies of the August 28, 2015, court order granting in part his motion for reconsideration.

### C.     The Confiscation of Kalafi's September 20, 2015 Mailing

On or around September 20, 2015, when Kalafi was not in general population, he submitted an unsealed envelope for mailing to his mother. The envelope contained the state court's order and a letter from Kalafi, directed to his mother. It is undisputed that the envelope was not mailed, but the parties dispute exactly why it was withheld.

Defendants contend that the letter was screened and flagged for review by Brown, in his capacity as STG Coordinator and pursuant to policy. Defendants explain that at WSPF, all outgoing mail written by inmates not in general population, except legal mail as defined by Wis. Admin. Code § DOC 309.04(3), is reviewed by third shift staff,[2] who check for contraband or illegal or unsafe communication. The institution has authority to conduct this type of screening pursuant to Wis. Admin. Code. § 309.04(1), and DAI Policy 309.04.01 "Inmate Mail." The institution conducts this review to ensure that outgoing mail does not contain contraband, and to ensure the safety of the institution, staff, inmates, and the general public. Furthermore, Wis. Admin. Code.  Section DOC 309.04(4)(c)5 prohibits delivery of outgoing mail in certain circumstances, including if the mail concerns activity that, if completed, would violate state law;

---

[2] Kalafi has submitted proposed facts detailing the screening policies for inmate-to-inmate communications and inmate-to-inmate communications about legal proceedings, as well as Brown's alleged interpretation of these policies.  However, the mail that is the subject of this lawsuit was not intended for another inmate, so these policies are not material to defendants' motion.

§ 309.04(4)(c)9 prohibits delivery of mail that contains information that, if communicated, would create a clear danger of physical or mental harm to any person.

Brown attests that pursuant to these policies, staff regularly route questionable or suspicious outgoing mail to him for further review.[3]  Brown further attests that on or around September 20, 2015, a staff member (whom Brown does not identify) provided him with Kalafi's mailing for his review.  (Brown Decl. (dkt. 38) ¶ 10.)  According to Brown, the envelope was not confiscated because it contained the court decision.  (*Id.* ¶ 22.)

Kalafi does not believe that some other staff member gave the envelope to Brown.  Kalafi believes that Brown was targeting Kalafi's mail, knowing that Kalafi wished to send his court opinion to other inmates, and that Brown retrieved the envelope himself to thwart Kalafi's plan.  To dispute Brown's statement that he received the envelope from a third shift staff member, Kalafi cites a DOC policy requiring the third shift officer picking up the mail to initial and date the reviewed mail (*see* Ex. 102, dkt. #35-1), pointing out that the envelope Brown received did not show anyone's initials.  Kalafi also points out that there is no record (beyond the conduct report that will be described below) that the mail had been intercepted.  However, Kalafi has not submitted evidence that Brown ever worked the third shift, and it is undisputed that mail from inmates in restrictive housing was not picked up until after 10:00 p.m.  As such, at most, Kalafi has submitted evidence that the third shift officer did not follow policy in failing to mark the envelope; Kalafi has not submitted evidence that contradicts Brown's statement that he received the envelope for review.

---

[3]  Kalafi objects to this proposed finding of fact as overbroad and vague.  However, this is a proposed factual finding, not a legal conclusion about the content of the materials forwarded to Brown for review.  Further, Kalafi does not purport to have personal knowledge related to what Brown actually was asked to review, so this proposed finding of fact is undisputed.

To prove that Brown knew that Kalafi wanted to circulate his favorable court decision, Kalafi also submits evidence that he had written to two other inmates (Glenn Turner and Raynard Jackson) who were housed at WSPF in 2015, discussing his state court victory. According to Turner, Brown had been monitoring his mail at that time. (*See* Turner Decl. (dkt. 59) ¶ 8.)[4] The fact that WSPF was monitoring Turner's mail, however, does not support Kalafi's assertion that Brown therefore was "fully aware" that Kalafi was sending his writ of certiorari decision to get copies made, so that he could send the order to other inmates on administrative confinement. (Kalafi First Decl. (dkt. 53) ¶ 35.) There is no indication in Brown's statement that he personally was performing the monitoring, and the monitoring was aimed at a different investigation of a different inmate. Even so, viewing these facts in the light most favorable to Kalafi, it is possible–perhaps likely–that someone monitoring Turner's mail, including Brown, saw Kalafi's letter to Turner regarding Kalafi's successful certiorari petition. This is the extent of Kalafi's evidence related to what Brown knew about Kalafi's intent to communicate his successful state court proceeding to other inmates.

### D.    Brown's Review of Kalafi's September 20, 2015 Mailing

Regardless of how the letter came to Brown, there is no dispute that Brown reviewed the contents of the letter on or around September 20, 2015. The envelope contained a letter and the court order granting his motion for reconsideration in his certiorari action. In the letter, Kalafi asked his mother to make five copies of his court order and to give the letter to her "son

---

[4] Turner cites to Brown's sworn declaration in *Turner v. Brown*, 16-cv-650, dkt. 95 ¶ 24: "Due to mail monitoring around this time, as well as discussions and ongoing investigation with other institutions, we had information that Turner wanted to draw attention to the conditions of solitary confinement at WSPF." Brown's statement is admissible here pursuant to Fed. R. Evid. 801(d)(2)(A).

Michael" to read the remainder of the letter, which contained the statements defendants deemed threatening.  (Ray Decl., Ex. 103 (dkt. 35-2) at 1-2.)

Kalafi directed one more statement to his mother: "I only wanted to contact your son Michael so he could stand on this scumbag Michael Ray for me, so make sure he read the back of this kite. . ."  (Brown Decl. (dkt. 38) ¶ 12; Ray Decl. Ex. 103 (dkt. 35-2) at 1.)  On the back of the note, Kalafi directed the following statements to Michael:

> Straight to the point.  This chump Michael Ray owe $2700.  He owed me $3500 but has only paid me $800 in the last 10/11 months.  He was trying to pull a move on me, Sheri wrote and told me he sold that whip – he never told me that, so if he sold it then where is my bread at?  Know what I'm sayin?  This is what I'll do for you[.] I need you to stand on this dude Gangsta Mentality and you can have $1200, send me $1500.  If I was out there his mama a being missin' another son. . .  If you ain't gone stand on it right don't say nathan to him at all - this is the # he gave me awhile back . . . .

(Ray Decl., Ex. 103 (dkt. 35-2)  2.)  Brown attests that the word "whip" is used to refer to a car, and "bread" is used to refer to money, so he understood Kalafi to be telling Michael that Michael Ray had sold a car and was not sending Kalafi the money he was owed for that sale.

Brown next states that it was apparent to him that Kalafi was trying to pay someone named Michael to cause harm, threaten, or harass another individual named Michael Ray. Brown interpreted the phrase "stand on this dude Gangsta Mentality" meant to threaten, harass, or cause harm to someone in order for that person to do what is asked of them.[5]  (Brown Decl. (dkt. 38) ¶ 14.)  Brown thus believed that Kalafi was asking Michael to do whatever it took to get the money from Michael Ray, which could include anything from harassment to bodily injury.  Finally, Brown attests that he believed the phrase "If I was out there his mama a bein

---

[5]  Again, Kalafi objects to Brown's interpretation of these statements as threatening, but he has not submitted evidence that actually disputes that Brown interpreted these statements in this manner.

missin another son" sounded as though Kalafi would cause bodily injury or death to Michael Ray if he was not incarcerated. (*Id.* ¶ 16.)

Brown explains that when a piece of outgoing mail contains threats of criminal activity or harm to any person, the Wisconsin Administrative Code explicitly prohibits delivery of that mail. *See* Wis. Admin. Code § DOC 309.04(4)(c)(1); Brown Decl. (dkt. 38) ¶ 17. Brown attests that Kalafi likely was aware of this policy and that his mail would be reviewed,[6] so he believes Kalafi used less direct language so his letter would be sent, and that he was indeed asking the recipient to do whatever it took to get the money back, including illegal activity and possibly murder. (Brown Decl. (dkt. 38) ¶¶ 18, 22.)

Kalafi disputes Brown's interpretation, attesting that the phrase was not meant to be threatening, harassing, or causing harm to another to get that person do so what is asked. Kalafi also includes declarations of five other individuals, including Michael Felton, who purports to be the Michael to whom Kalafi directed his statements. Each of these individuals agree that Brown's interpretation of the meaning of "stand on" was wrong, and that the phrase "stand on" is a way to emphasize to someone that they should do what they said they would do. (Turner Decl. (dkt. 59) ¶ 16; Felton Decl. (dkt. 61) ¶ 7; Thomas Decl. (dkt. 55) ¶ 5; Mathews Decl. (dkt. 58) ¶ 4; Jackson Decl. (dkt. 60) ¶ 9.) Michael Felton further explains that he had already agreed to call Michael Ray about the debt, and Kalafi's use of the phrase "stand on" was meant to reiterate to Michael that he should make good on his promise to Kalafi to call Michael Ray. (*See*

---

[6] Kalafi agrees that he was aware that his mail would be reviewed, but attests that it was screened in retaliation by WSPF staff. Kalafi does not detail or submit evidence related to his charge that his mail was screened inappropriately. Regardless, what is material for purposes of Kalafi's claim in this lawsuit is that Kalafi was aware that his mail would be reviewed.

Felton Decl. (dkt. 61) ¶ 7.)  However, Kalafi does not submit evidence suggesting that Brown's stated interpretation was disingenuous.

Based on his interpretation of the statements in the letter, Brown believed that Kalafi violated Wis. Admin. Code §§ DOC 303.49(9) and DOC 303.18(1), "Unauthorized Use of Mail" and "Threats."  Therefore Brown issued Kalafi a conduct report, charging him with violating those two policies.  Brown attests that, although he briefly skimmed the court decision contained in the envelop with the letter, the court decision was not a reason that the envelope had been confiscated.  (Brown Decl. (dkt. 38) ¶ 22.)  Rather, Brown states that because the court decision was part of the contents of the envelop containing the letter that had been deemed contraband, he would have kept all of the contents together and submitted everything that was contained in the envelope as evidence along with the conduct report.  Brown believes that Kalafi may have included the court opinion in the envelop in an effort to disguise the mailing as legal mail to avoid staff review of the letter.  (*Id.*)

Kalafi disputes Brown's stated reason for withholding the court order, claiming that Brown did not want the court decision to circulate among inmates on administrative confinement.  Yet Kalafi does not cite evidence that creates a genuine dispute of fact about why Brown withheld the order; instead, Kalafi cites to his own declaration and that of inmate Turner, who do not attest to being aware of Brown's motivation or personal knowledge at the time he reviewed the letter and wrote the conduct report.  (Kalafi First Decl. (dkt. 53) ¶ 17; Turner Decl. (dkt. 59) ¶¶ 7-10.)  Again, Turner cites to Brown's acknowledgment that Turner was on mail monitoring at that time, and Turner opines that Brown "had an interest" in keeping the court opinion from other inmates on administrative confinement.  (Turner Decl. (dkt. 59) ¶ 10.)

To justify Brown's decision to keep the court order and letter together when he submitted the conduct report, defendants submit a declaration from non-defendant Mark Kartman, WSPF's Security Director.  Kartman attests that keeping all the contents of the envelope together was a standard measure taken to protect the integrity of the evidence related to the charges in the conduct report.  (Kartman Decl. (dkt. 40) ¶ 6.)  Kartman specifically explains that if staff had to separate out mailings and returned allowable items, it would be unnecessarily burdensome, that review could interfere with the disciplinary process, and staff may be accused of tampering with evidence.  (*Id.* ¶ 6.)  Kartman adds that evidence, including evidence deemed contraband, is preserved for at least 120 days, to ensure the inmate has access to the materials in the event of an appeal or inmate complaint.  (*Id.* ¶ 7.)

Kalafi does not directly dispute the existence of the general practice Kartman outlines, but he claims it is not universally followed.  Kalafi cites another instance in which an inmate was punished for statements made in letters to other inmates, but was still able to send those letters.  Specifically, in 2011, Turner was charged with multiple code violations for writing letters to multiple inmates allegedly offering them positions within the Gangster Disciples.  Kalafi points out that even though the conduct report directed that evidence should be retained, Kalafi and other inmates still received the letters.  Kalafi has not submitted evidence that Brown or any defendants were involved in allowing that mail to be delivered.

After writing the conduct report, Brown had no further involvement in the disciplinary proceedings related to the conduct report.  Kalafi did not request that Brown attend the disciplinary hearing, so he did not attend, and Brown was not involved in issuing a finding of guilt or disposition to Kalafi.  Brown attests that he does not recall being asked to return the court decision to Kalafi.  Kalafi disputes this, claiming that he submitted a "DOC 73," asking

for return of the court order.  (*See* Kalafi First Decl. (dkt. 53) ¶ 17; Ex. 100 (dkt. 17-1) at 7; Kalafi Second Decl. (dkt. 54) ¶ 17.)  However, this form does not include any notation suggesting that Brown reviewed it, and Kalafi has not submitted evidence suggesting that Brown reviewed this request, much less denied it.

### E.    Disciplinary Hearing

On October 8, 2015, Kalafi attended a disciplinary hearing related to the charges in the conduct report, where defendant Cichanowicz served as the hearing officer.  At the hearing, Kalafi provided a verbal statement, claiming that the letter did "not detail anything specific about threat harm or harass."  (Cichanowicz Decl. (dkt. 39) ¶ 17; dkt. 17-1, at 5.)  Kalafi also submitted a three-page written statement, arguing that the conduct report should be overturned because there was "no specific direct order of threat, harass or intimidation demand," and requesting at the close of the hearing that his court order be returned to him so he could make copies.  (Dkt. 17-1, at 9-11.)

Cichanowicz details his review of the evidence presented at the disciplinary hearing, attesting that he reviewed the entire contents of the envelope, determined that the letter contained threatening language, and discussed the letter with Kalafi at the hearing.  Cichanowicz acknowledged Kalafi's defense, but told Kalafi his belief that the language of the letter belied Kalafi's explanation, citing to the same statements Brown deemed threatening.  After considering all of the evidence, including Kalafi's written and verbal statements, Cichanowicz determined that it was more likely than not that Kalafi was guilty of both Unauthorized Use of the Mail and Threats.  Cichanowicz found Kalafi guilty of both charges and issued him a disposition of 60 days in disciplinary separation.  Cichanowicz further ordered the evidence (the entire contents

11

of the envelope) to be retained.  Cichanowicz attests that he held no bias against Kalafi, and that he had no involvement in intercepting the envelope or writing the conduct report.  Rather, Cichanowicz attests that he agreed with Brown's interpretation of the phrase "stand on," and thus that Kalafi intended to ask Michael to threaten, harass, intimidate or cause harm to Michael Ray.

As to the court order, Cichanowicz attests that because the evidence submitted with the conduct report – all of the contents of the envelope Brown confiscated – was deemed contraband, he would not have separated the contents of the envelope.  Cichanowicz acknowledges that the court order did not contain any threats, but maintains that it too was contraband because it was part of the mail that violated the Wisconsin Administrative Code.

Kalafi challenges Cichanowicz's findings, pointing out that in the conduct report disposition, Cichanowicz added the word "with" to a sentence from the letter, paraphrasing the sentence as Kalafi discussing a "money transaction for somebody to 'stand' on Michael Ray with 'Gangsta Mentality.'" (*Id.* at 9-10.)  He claims Cichanowicz changed the wording in bad faith, to make the statement in the letter sound more like a threat.  Kalafi further challenges Cichanowicz's interpretation of the phrase "stand on," pointing out that in discovery, Cichanowicz admitted that he had no formal classroom education on African American slang, nor knowledge of any studies of African American studies, or any history of black culture that would qualify him to interpret the phrase "stand on."  That said, Kalafi has not come forward with evidence that actually disputes Cichanowicz's statement about what he actually believed "stand on" meant at the time of the conduct report hearing, and Cichanowicz acknowledges that he incorrectly added the word "with."  Furthermore, in the hearing decision, Cichanowicz quoted

12

that sentence of the letter correctly, reciting it as "I need you to stand on this dude Gangsta Mentality and you can have $1200, send me $1500."

### F.     Conduct Report Appeal

On October 13, 2015, Kalafi appealed the findings of guilt and disposition of the conduct report.  Kalafi argued in his appeal that there was insufficient evidence to find him guilty, again denying that he was making threats in the letter.  Kalafi brought up the court decision once in his appeal, and in asking for a remedy, he said that his legal material should be returned for mailing.

Defendant Winkleski received the appeal on October 14, 2015.  In addressing the appeal, Winkleski had access to the conduct report and all evidence used at the hearing.  Winkleski read the letter Kalafi addressed to his mother, and he agreed with Cichanowicz that the statements in the letter constituted violations of the Wisconsin Administrative Code because they were threatening.  Winkleski noted that Kalafi clearly stated that he wanted the recipient of the letter to at least intimidate or harass a person named Michael Ray for money allegedly owed to Kalafi. (Winkleski Decl. (dkt. 37) ¶ 14.)  Winkleski does not recall reading the court decision that was part of the evidence, since the decision was not the reason for the conduct report.  (*Id.* ¶ 15.) Nor does Winkleski recall ever receiving the court decision before resolving Kalafi's appeal.  (*Id.*) On November 4, 2015, Winkleski affirmed Cichanowicz's decision.

The court decision was not returned to Kalafi.  Winkleski attests that staff generally do not split up portions of mail that has been deemed contraband; instead, the entire mailing becomes contraband and is not broken apart.  He states that because the hearing officer deemed

13

the contents of the envelope contraband, he would not have split up the contents of the contraband envelope and returned a portion to Kalafi.

OPINION

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).  During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by  speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

## II.    First Amendment Free Speech Claim

Defendants seek judgment as a matter of law with respect to Kalafi's First Amendment free speech claim because the statements related to Ray in the letter constitute a "true threat" not protected by the First Amendment, and in any event, defendants' decision to confiscate letter – and the court decision along with the letter – was constitutionally permissible.

14

Generally speaking, restrictions on prisoners' outgoing mail must: (1) promote "one or more of the substantial governmental interests of security, order, and rehabilitation," *and* (2) be "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez,* 416 U.S. 396, 413 (1974). In formulating this standard, the Supreme Court recognized that "[s]ome latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty." *Id.* at 414. The Supreme Court explains that the "no greater than necessary" standard is not as demanding as strict scrutiny is "least restrictive means" requirement; rather, the primary focus is on whether the restriction actually responded to a "threat to prison order and security" inside the prison. *See Thornburgh v. Abbott,* 490 U.S. 401, 412 (1989) (citing *Martinez,* 416 U.S. at 412).

Defendants provide separate justifications for the confiscation of the letter and the confiscation of the court order along with the letter. Therefore, I address the application of this standard to the two items in the mailing separately.

### A.      Confiscation of the Letter

At screening, I noted that the statements in Kalafi's letters would appear to constitute a true threat, which is not constitutionally protected. Defendants seek summary judgment on Kalafi's free speech claim arising from the confiscation of the letter on this ground, and because the confiscation satisfies the *Martinez* standard. In opposition, Kalafi maintains that his statements could not constitute a true threat, and for that reason, the confiscation of the letter cannot satisfy the *Martinez* standard.

15

Starting with the true threat question, "the First Amendment does not preclude restrictions on certain categories of speech having little or no social value, and threats are one such category." *United States v. Parr*, 545 F.3d 491, 496-97 (7th Cir. 2008) (citing *Virginia v. Black*, 538 U.S. 343, 358-59, 123 S. Ct. 1536 (2003)). "A statement qualifies as a 'true threat,' unprotected by the First Amendment, if it a 'serious expression of an intent to commit an act of unlawful violence on a particular individual or group of individuals.'" *Id.* at 497 (quoting *Black*, 538 U.S. at 359, 123 S. Ct. 1536). Recently, the Court of Appeals for the Seventh Circuit acknowledged that prior to the Supreme Court's decision in *Black*, the Seventh Circuit had applied an objective standard to determine whether speech constituted a true threat; however, given the emphasis on the speaker's intent in *Black*, the Seventh Circuit and other courts "have wondered whether speech only qualifies as a true threat if the speaker subjectively intended his words to be threatening." *Maier v. Smith*, 912 F.3d 1064, 1072 (7th Cir. 2019) (citing *Parr*, 545 F.3d at 499-500); *United States v. Dutcher*, 851 F.3d 757 (7th Cir. 2017) ("A true threat does not require that the speaker intend to carry it out, or even that she have the capacity to do so.") (citing *Black*, 538 U.S. at 360). However, the court also noted that even assuming the Supreme Court had intended to include a subjective requirement, as of 2019, it still had not made explicit this intent. *Maier,* 912 F.3d at 1072.

Defendants acknowledge that Kalafi's directions to Michael about Michael Ray were not explicitly violent but they maintain that the statements satisfy the true threat standard. They cite Kalafi's undisputed statements: he asked Michael to "stand on this scumbag Michael Ray"; he believed that Michael Ray was "trying to pull a move on" him; he wanted Michael to "stand on this dude Gangsta Mentality"; he offered Michael $1200 for collecting the debt; and, critically, "If I was out there his mama a being missin' another son." (Ex. 103 (dkt. 35-2) at 2.)

Defendants argue that taking these statements together Kalafi clearly is signaling/communicating to Michael that Kalafi would kill Michael Ray if given a chance, which in turn indicates that Kalafi intends Michael to employ that same degree of force against Ray if necessary.

Kalafi maintains on the other hand that he did not actually intend to direct Michael to harass, intimidate, or harm Michael Ray, and that defendants unreasonably misinterpreted his use of the phrase "stand on" in the letter. Kalafi correctly points out that Brown did not actually investigate his mental state at the time he wrote the letter, and that he has denied any intent that Ray be harmed, which should eliminate *any* finding that he, in fact, intended that Michael harm Ray. Kalafi further contends that his statement about what he would do if he were out of prison could not reasonably be considered a threat, since he was, in fact, imprisoned. Finally, he cites another portion of the letter in which he wrote to Michael "don't say nathan" if he would not "stand on it right," and provided a phone number for Ray, intending that Michael merely call Ray, not threaten him, much less commit an act of violence against him.

Taking all of Kalafi's statements together, and viewing them in a light most favorable to Kalafi, I accept that his assertions may not have been so explicit that no reasonable jury could conclude that a serious threat was not intended.[7] But in the end, it doesn't matter because defendants' seizure of Kalafi's letter passes muster under *Martinez*.

Under *Martinez*, the first question is whether the defendants' censorship of his speech was in furtherance of a substantial government interest. The parties do not dispute that maintaining

---

[7] This conclusion is buttressed by the general principle that whether a statement constitutes a true threat is an issue of fact for the jury to decide. *United States v. Saunders*, 166 F.3d 907, 912 (7th Cir. 1999); *see also Parr*, 545 F.3d at 498 ("We think it readily apparent that Parr's statements were threats, but ultimately that question was for the jury.") (citing *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) ("The threat in this case was ambiguous, but the task of interpretation was for the jury.") (citation omitted)). Maybe I'm putting a square jurisprudential peg in a round hole since this principle arises in criminal prosecutions where summary judgment is unavailable, but prudence suggests that I at least acknowledge the principle in a footnote.

public safety and preventing illegal activities constitute substantial government interests. *See*
*Lagar v. Tegels*, No. 14-cv-036-wmc, 2016 WL 6990011, at *10 (W.D. Wis. Nov. 29, 2016)
("The state also has a substantial interest in protecting the public, including an inmate's family
and friends, from manipulation and other 'antisocial acts.'") (quoting *Woods v. Comm'r of Ind.*
*Dep't of Corr.*, 652 F.3d 745, 748 (7th Cir. 2011); *Flynn v. Burns*, 289 F. Supp. 3d 948, 963 (E.D.
Wis. 2018) (citing *Lagar v. Tegel*, No. 14-cv-36-wmc, 2016 WL 6990011, at *10 (W.D. Wis.
Nov. 29, 2016 (accepting that prison officials have a substantial interest in protecting the
public)). Indeed, "[c]ourts have ruled that censorship of outgoing mail is valid primarily to
restrict contraband material or to limit speech related to escape plans, criminal activity, threats
of blackmail or extortion or coded messages." *Koutnik v. Brown*, 396 F. Supp. 2d 978, 985 (W.D.
Wis. 2005); *see also Thornburgh*, 490 U.S. at 412 ("Dangerous outgoing correspondence is more
likely to fall within readily identifiable categories: . . . escape plans, plans related to ongoing
criminal activity, and threats of blackmail or extortion.").

What the parties dispute is whether Kalafi's statements in the letter actually amounted
to an attempt at illegal activity or a threat to Ray, thus justifying confiscation. As prison officials
responsible for preventing prisoners from violating policy and protecting the public, defendants
are entitled to "particular deference and latitude." *See Rios v. Lane*, 812 F.2d 1032, 1037 (7th
Cir. 1987) (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), *Jones v. North Carolina Prisoners'*
*Labor Union, Inc.*, 433 U.S. 119, 129 (1977), and *Martinez*, 416 U.S. at 414)); *see also Overton*
*v. Bazzetta*, 539 U.S. 126, 132 (2003) (courts must "accord substantial deference to the
professional judgment of prison administrators, who bear a significant responsibility for defining
the legitimate goals of a corrections system and for determining the most appropriate means to
accomplish them."). Therefore, "prison administrators are not required to 'show with certainty

18

that adverse consequences would follow from a failure to [act].'" *Rios*, 812 F.2d at 1037 (quoting *Martinez*, 416 U.S. at 413). With this standard in mind, when evaluating Brown's, Cichanowicz's, and Winkleski's interpretations of the statements in the letter, the question is not whether they were correct about Kalafi's intent, but whether it was reasonable for them to perceive the letter as a threat to public safety. *Van den Bosch v. Raemisch*, 658 F.3d 778, 788 (7th Cir. 2011); *Shaw v. Murphy*, 532 U.S. 223, 230 (2001) ("[P]rison officials are to remain the primary arbiters of the problems that arise in prison management.").

Brown, Cichanowicz, and Winkleski each attest that they genuinely believed that Kalafi intended for Michael to threaten, force, or use whatever means was necessary to ensure that Ray paid Michael the money he owed Kalafi. It is undisputed that each defendant believed that Kalafi's use of the phrases "stand on this dude Gangsta Mentality" and "If I was out there his mama a bein missin another son," meant that Kalafi wanted Michael to use whatever means necessary, including threats and violence, to get Ray to pay the money he owed Kalafi, and that Kalafi himself would kill Ray if given the chance. Brown further attests that, based on his experience as WSPF's STG coordinator, he believed that Kalafi was using less direct language in the letter to an effort to avoid having his letter screened and held back for using threats of criminal behavior. Brown's experience in interpreting prisoner communications is undisputed and extensive: as of 2015, Brown had been responsible for leading WSPF's investigations into gang activity and other unsanctioned activity for over ten years. *See Koutnik v. Brown*, 456 F.3d 777 (7th Cir. 2006) (deferring to prison staff's assessment that correspondence contained gang symptoms given prison officials' interactions with and observation of prisoners).

Kalafi insists that the statements in the letter were not a threat to the public, arguing that (1) he could not have personally harmed Ray because he was imprisoned,(2) he did not actually

intend that Michael harm Ray and defendants misinterpreted his statements in the letter, and (3) prison policy permitted him to seek favors from family members and friends.  Kalafi claims that all he wanted Michael to do was call Ray, which could not reasonably be perceived as a threat.  He further suggests that Brown and Cichanowicz misinterpreted his words, due to either ignorance of black slang or racial animus.

Kalafi's suggestion of racial bias is not grounded in evidence of record, and Kalafi does not explain how defendants' alleged ignorance of black slang led them to unreasonably interpret his statements as a threat.  At most, the misunderstanding was that the phrase "stand on" indicated that Michael had previously promised Kalafi to reach out to Ray about the debt, and Kalafi meant that Michael follow up on that agreement, not to use force against him.  Even assuming defendants were wrong about this phrase, any mistake was reasonable, given Kalafi's other statements in the letter.  Again, Kalafi explicitly asked Michael to get into contact with Ray to get the $2700 he owed Kalafi, and Kalafi does not deny that he wanted Michael to exert pressure on Ray to pay the money.  Significantly, Kalafi does not present a plausible explanation for his comment suggesting that *he* would kill Ray if he was free; Kalafi claims that those words lacked meaning, since he is incarcerated, but that's sophistry.  Given that this statement comes at the heels of Kalafi recruiting Michael to act as his agent, it was eminently reasonable for defendants to interpret this statement as Kalafi's signal to Michael to use any means necessary, including threats and possibly even murder, to ensure Ray's compliance.

Kalafi further points to Cichanowicz' mistaken inclusion of the word "with" in the "stand on Gangsta Mentality" phrase, as evidence that Cichanowicz's interpretation of his words was unreasonable.  Defendants acknowledge Cichanowicz's mistake but point out that Cichanowicz's decision also quoted Kalafi's statements accurately.  In any event, Kalafi does not explain how

Cichanowicz's misstatement demonstrates an unreasonable interpretation of Kalafi's statements as threatening.

Finally, Kalafi points out that defendants provided him a copy of the letter he attempted to send along with their summary judgment materials, arguing that if the letter actually was threatening, then they would not have filed it and allowed him to possess it. Yet defense counsel's decision to provide Kalafi a letter is not evidence that in 2015, defendants did not genuinely and reasonably believe that Kalafi's instructions to Ray posed a threat to public safety. As such, on this record, there is no dispute that the confiscation of Kalafi's letter to his mother furthered the substantial interests in public safety and preventing illegal activities.

## B.    Confiscation of the Court Order Satisfies the *Martinez* Standard

Defendants' confiscation of the court order along with the letter was consistent with the *Martinez* standard. The evidence of record establishes that defendants' general practice of confiscating the entire mailing because it was subject to investigation furthered the important interest in institutional security. To the extent the confiscation of the court order is a closer call, defendants are entitled to qualified immunity.

The decision to confiscate the court order in addition to the letter requires close consideration because there is no question that the court order, on its own, did not constitute contraband. However, defendants represent that their confiscation of the court order along with the letter was consistent with the general practices associated with investigating mailings, and they submit evidence that this policy is necessary to preserve the integrity of investigations of prisoner mail. Kartman attests that keeping an entire mailing together pending an investigation is necessary to maintain the integrity of investigations because: (1) requiring staff to piece apart

21

the mail would be administratively burdensome and create questions about whether redactions would be necessary, or whether certain pages would need to be excised; (2) inmates subject to investigation may accuse staff of tampering with their mail if items are removed; and (3) keeping the mailing together for at least 120 days preserves the record of the investigation, in the event of an appeal or an inmate complaint. Kartman's attestation provides persuasive justification for the decision to confiscate Kalafi's entire mailing, especially because courts "'generally defer to the judgment of prison officials when they are evaluating what is necessary to preserve institutional order and discipline." *Koutnik v. Brown*, 189 F. App'x 546, 549 (7th Cir. 2006) (quoting *Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005)).

Kalafi tries to cast doubt on defendants' evidence about this general policy in two ways. First he claims that WSPF staff have been inconsistent with respect to this policy. Kalafi points to one instance in 2011 when inmate Turner was issued a conduct report related to letters recruiting other inmates to the Gangster Disciples. Although Turner was punished for having the letters, Kalafi maintains that Turner still was allowed to send them out; a fortiori, argues Kalafi, WSPF should have returned to him a copy of the court order. However, Kalafi has not submitted evidence suggesting that, in those letters, Turner was soliciting anyone to threaten or harass another person, and defendants suggest that WSPF officials may have intentionally allowed the letters to be circulated because they were investigating gang activities at the institution. More to the point, evidence that prison officials do not always follow a general policy is not evidence that the procedure itself is inappropriate or unnecessary. *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) ("[T]he deference we afford prisons permits . . . inconsistencies."); *see also Azeez v. Fairman*, 795 F.2d 1296, 1299 (7th Cir. 1986) ("The failure to enforce a rule consistently does not make the rule unconstitutional.") (citations omitted).

Therefore, the fact that on *one occasion* another prisoner's letters may have been sent to their intended recipients even though they were the subject of a conduct report is not a reason to find that confiscating Kalafi's entire mailing was not generally necessary to further institutional security.

Kalafi also suggests that the general policy Kartman describes should not have applied to his mailing because the court order obviously was severable from the letter. This argument has no traction. For one, in the first paragraph of Kalafi's letter to his mother, he asks her to make copies of the order, so the two documents are not as unrelated as Kalafi represents. More importantly, the very purpose of the policy outlined by Security Director Kartman is to avoid individualized determinations related to whether only portions of a mailing could constitute contraband. Kalafi's opinion that separating out contraband from permissible mail items would have been easy in his case is not a reason to exempt him from this general policy. To make that assessment, the reviewing officer still would have to make a judgment call, one that could be wrong, or if not wrong, could be characterized later by the inmate as tampering in subsequent disciplinary proceedings or in an inmate complaint. On this record, I agree that the decision to confiscate the court order along with the letter furthered the prison's substantial interest in security, and was no greater than necessary in Kalafi's circumstances.

In any event, defendants' qualified immunity defense is well-taken on these facts. Qualified immunity "protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). The inquiry is two-fold: (1) do the facts, taken in the light most favorable to the plaintiff, show that the defendants

violated a constitutional right? and (2) was this constitutional right clearly established at the time of the alleged violation? *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). The Court of Appeals for the Seventh Circuit directs that "clearly established law cannot be framed at a 'high level of generality.'" *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074 (2011)). Rather, existing caselaw must dictate the resolution of the parties' dispute: precedent must have placed the constitutional question beyond debate. *Campbell*, 936 F.3d at 545. Accordingly, courts must frame the constitutional right in terms granular enough to provide fair notice. *Id.*

The parties have not directed the court to any Supreme Court or Seventh Circuit decision holding that prison officials violate a prisoner's First Amendment rights by withholding an entire mailing because part of it contains contraband or is subject to investigation. Defendants point out that there is very little case law discussing the validity of an "all or nothing" policy related to withholding outgoing mail, but point out that when all or nothing withholding policies have been challenged under the more deferential standard governing incoming mail set forth in *Turner v. Safely*, 482 U.S. 78 (1987), such policies have been upheld. In *Thornburgh*, the Supreme Court addressed a practice of withholding entire publications under the *Turner* standard, finding that the policy was not "an exaggerated response." *Thornburgh*, 490 U.S. at 419. Defendants also point to multiple district court decisions from other circuits, upholding policies in which prison officials withheld, rather than redacted, problematic publications coming into the prison, citing the burden that requiring redacting would impose on prison officials. *Ray v. Williams*, No. CV-04-863-HU, 2005 WL 697041, at *8 (D. Or. 2005) (citing *Thornburgh*'s approval of an "all or nothing regulation," and noting that "[r]edaction is not a *de minimus* alternative"); *Hill v. Commandant, U.S. Disciplinary Barracks*, No. CIV.A 03-3325-CM, 2005 WL 2122656, at *5 (D.

24

Kan. Aug. 10, 2005) (finding that the amount of mail coming into prison rendered redacting prohibited material unreasonable); *Taniguchi v. Lappin*, No. CIV.A. 04CV304DLB, 2005 WL 1334634, at *7 (E.D. Ky. June 6, 2005) (rejecting the notion that redacting sexually aggressive photographs was a "ready alternative" to withholding such photographs).  This court's research into pre-September 2015 case law addressing the question of all-or-nothing confiscation in the context of outgoing mail uncovered nothing useful.

Of course, the *Martinez* standard is more rigorous than the *Turner* standard when it comes to considering the availability of alternatives, but the *Martinez* standard requires prison officials to ensure that the restriction on speech is "generally necessary" to further the stated governmental interest; it does not require prison officials to use the least restrictive means necessary to further the stated interest.  *See also Thornburgh*, 490 U.S. at 412 (the primary focus of the analysis of the restriction is whether it actually responded to a "threat to prison order and security").  Thus, faced with defendants' undisputed statements that they withheld the court order along with the letter in compliance with a general practice, coupled with Kartman's undisputed justification that prison staff keep together packages of mail that are under investigation in order to maintain the integrity of the investigation, I cannot conclude that in September 2015, defendants would have been aware that the practice ran afoul of Kalafi's First Amendment rights.  Therefore, defendants are entitled to summary judgment on the merits of Kalafi's First Amendment claim and on qualified immunity grounds.

### III.   Retaliation

"An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).  To prove a retaliation claim under the First Amendment, Kalafi must show that:  (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in the protected activity in the future; and (3) the protected activity was a motivating factor in defendants' decision to take retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  Once a plaintiff makes that showing, the burden shifts to the defendants to prove by a preponderance of the evidence that the same actions would have occurred even in the absence of protected conduct.  *Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir. 2011).

Defendants concede element (2), that the conduct report and associated punishment are sufficiently adverse to deter a prisoner of ordinary firmness from engaging in protected conduct. They focus their arguments on elements (1) and (3).  First, defendants direct the court to their arguments that the statements in Kalafi's letter related to Ray were unprotected, and that the confiscation of the entirety of the package furthered the important interest in protecting the public.  For the reasons already explained above, I agree that Kalafi's statements in the letter are not protected.  However, the court order Kalafi intended to send his mother is constitutionally protected, and Kalafi claims that this is what motivated the conduct report, not his statements in the letter.  So defendants are not entitled to summary judgment on the protected conduct element of this claim.  Instead, they are entitled to summary judgment because no evidence of record supports a reasonable finding that the defendants sought to punish Kalafi for succeeding in his challenge to his administrative confinement review in state court, or for attempting to send

his court order to his mother or other prisoners.  Rather, the evidence establishes that Kalafi's mailing was confiscated and Kalafi was punished because of Kalafi's statements specifically about Ray.  Kalafi's assertion of a retaliatory motive remains speculative.

### A.    Brown

Kalafi maintains that in September of 2015, Brown sought to prevent Kalafi from sharing his state court win with other inmates housed in administrative confinement.  However, Brown attests that he was not involved in the events related to Kalafi's administrative confinement decisions, and, as explained above,  Kalafi has not come forward with evidence that directly contradicts Brown's statements.

Kalafi also believes that Brown was improperly screening his mail, hoping to uncover grounds to punish him.  Kalafi lays out his theory that Brown was improperly screening his mail and that he lied by attesting that a third shift officer turned over Kalafi's envelope for Brown's review.  To the extent Kalafi is alleging that the review of his mail did not follow prison policies, any alleged failure to abide by prison policies does not establish a constitutional violation.

More importantly, Kalafi's allegation is devoid of factual support.  He has not come forward with evidence directly disputing Brown's statement that on or around September 20, he received the envelope Kalafi intended to send to his mother.  Nor has Kalafi come forward with evidence supporting his suspicion that Brown was on a mission to punish him for succeeding in his state court certiorari action and to prevent him from circulating the court order.  All Kalafi has is Brown's statement in a declaration in another lawsuit that inmate Turner's mail was being reviewed during the relevant time period.  Even assuming that Brown knew that Kalafi wanted to circulate the state court opinion, this does not support a finding that

Brown wanted to prevent Kalafi from circulating it, or to punish Kalafi for attempting to circulate it. Therefore, the question becomes whether Kalafi has submitted any evidence supporting a finding that Brown intended to punish Kalafi for succeeding in his state court action when he wrote the conduct report. He has not. It remains undisputed that Brown interpreted Kalafi's statements to be threatening.

In any event, when Brown turned over the entire envelope as evidence in support of the conduct report charges, he had a legitimate reason for it, supported by Security Director Kartman: prison officials do not piece apart inmate mail that is under investigation to maintain the integrity of the investigation. Kalafi has not submitted evidence calling into question the veracity of Kartman's or Brown's justifications for keeping these materials together when the investigation into Kalafi's statements in the letter commenced. Although Kalafi contests the policy as applied to him, that is not evidence that Brown sought to punish him for anything other than the statement in the letter. Moreover, Brown's involvement ended with writing the conduct report. He was not called as a witness at the hearing, nor was he responsible for holding the hearing, for the guilty finding, for the 60-day segregation disposition, or for the confiscation of the entire envelope of materials that were part of Kalafi's intended mailing.

In sum, the evidence of record might support a finding that Brown was *aware* that Kalafi intended to make copies of the court decision and send them to other inmates. However, Kalafi has no evidence that would support a reasonable inference that Brown wrote the conduct report to punish to punish Kalafi for succeeding in his motion for reconsideration. Therefore, defendants are entitled to summary judgment with respect to Kalafi's retaliation claim against Brown.

28

### B.   Cichanowicz

Cichanowicz also is entitled to summary judgment.  He attests that he found Kalafi guilty of the charges in the conduct report based on the statements in the letter, and Kalafi has not submitted evidence suggesting that Cichanowicz was otherwise motivated.

Kalafi targets Cichanowicz's incorrect recitation of one of the statements in the letter, arguing that he is ignorant of black slang and acted in bad faith.  However, Cichanowicz acknowledges he incorrectly recited this letter, but still attests that he believed Kalafi's accurate statements to be a threat.  The one misstatement does not call into question Cichanowicz's motivation in finding Kalafi guilty, and, in any event, Kalafi does not attempt to connect the misstatement to a motive by Cichanowicz to punish Kalafi for his successful court decision. Indeed, Kalafi's state court order was hardly mentioned during the conduct report hearing.  It is undisputed that Kalafi's defense during the hearing did not focus on the court opinion in the envelope, and Kalafi does not suggest that Cichanowicz made any statements that might indicate that presence of the court order in the envelope influenced his finding of guilt and the disciplinary separation order in any way.  Therefore, Cichanowicz is entitled to judgment in his favor on Kalafi's retaliation claim as well.

### C.   Winkleski

Finally, no evidence suggests Winkleski's denied Kalafi's appeal of Cichanowicz's decision for an improper reason.  Beyond disagreeing with  the substance of Winkleski's decision, Kalafi does not point to any evidence suggesting that Winkleski affirmed the guilty finding because of Kalafi's state court action.   Critically, in his opposition brief, Kalafi does not mention Winkleski's motivation at all. Therefore, Winkleski is entitled to summary judgment as well.

To survive summary judgment on his retaliation claims, Kalafi had to come forward with *some* evidence related to the defendants' motivation to punish him for sending the court order, not for the statements he directed to Michael in the letter. *See Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) ("Even though Devbrow's verified complaint alleges retaliation, his speculation regarding the officers' motive cannot overcome the contrary evidence that [defendants'] actions were benign.") (citations omitted).  Without any evidence suggesting that defendants punished Kalafi because he successfully pursued his motion for reconsideration – as opposed to because of what they reasonably interpreted to be threatening statements – Kalafi's retaliation claims remain speculative.  Therefore, defendants are entitled to summary judgment, on these claims, in addition to Kalafi's free speech claims.


## ORDER

IT IS ORDERED that:

1) Defendants Brown, Cichanowicz, and Winkleski's motion for summary judgment (dkt. 32) is GRANTED.

2) Defendants' motion to stay (dkt. 72) is DENIED as moot.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.


Entered this 9th day of March, 2021

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge